Filed 6/5/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GEORGE DENNIS ROUNDS, JR.,<br><br>    Defendant and Appellant. | G063593<br><br>(Super. Ct. No. FELSB21000174)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of San Bernardino County, J. David Mazurek, Judge. Reversed.

David R. Greifinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

George Dennis Rounds, Jr., challenges the trial court's denial of his petition for a certificate of rehabilitation and pardon. (Pen. Code, § 4852.01 et seq.)[1] We conclude the court erred.

In evaluating the petition, the trial court considered multiple factors that have no bearing on the statutory criteria for evaluating a petition for a certificate of rehabilitation, including the nature of the underlying crime, the unfairness to the victims of granting the petition, and Rounds's failure to plead guilty to a more serious charge. The remaining reason cited by the court for denying the petition—Rounds's purported refusal to take responsibility for his conduct based on a supposed inconsistency between his statements to the Board of Parole Hearings (Parole Board) and those in his petition and at the hearing thereon—is not fairly supported by the record. With this single exception, the court did not address the relevant statutory factors, and did not so much as mention Rounds's character and conduct in the nearly 40 years following the crime.

The trial court's abuse of discretion amounts to a miscarriage of justice. We reverse. We publish this opinion to clarify the factors the trial court may consider when evaluating a petition for a certificate of rehabilitation and pardon.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

In February 1983, Rounds pled guilty to one count of second degree murder (§ 187, subd. (a)) and one count of attempted murder (§§ 187, subd. (a), 664, subd. (a)). The trial court sentenced him to an indefinite term of 15 years to life, plus a concurrent definite term of seven years. The court also imposed and stayed two two-year firearm sentencing enhancements.

Twenty-seven years later, in 2010, Rounds was found suitable for parole, and he was paroled on August 3, 2010. Rounds was discharged from parole on October 3, 2014.

---

[1] All further statutory references are to the Penal Code.

Seven years after being discharged from parole, and more than 38 years after committing the underlying crimes, Rounds filed a petition for a certificate of rehabilitation and pardon on December 27, 2021. A public defender was appointed to represent him, but a later request by Rounds to represent himself was granted. In February 2022, the trial court referred the matter to the district attorney for a background investigation. The investigative report from the district attorney's office was filed with the court in October 2022.[2] It concluded Rounds was statutorily eligible for a certificate of rehabilitation and pardon.

The trial court conducted a hearing on Rounds's petition in November 2022. The district attorney opposed the petition because Rounds allegedly had failed to demonstrate insight, accountability, and restoration. On December 19, 2022, the court issued a written order denying the petition. Rounds filed a timely notice of appeal, and the trial court granted his request for a certificate of probable cause.

DISCUSSION

I.

STANDARD OF REVIEW

"[R]eview of a grant or denial of a certificate of rehabilitation is confined to an abuse of discretion standard." (*People v. Lockwood* (1998) 66 Cal.App.4th 222, 226.) A trial court abuses its discretion when the decision exceeds the bounds of reason (*People v. Blocker* (2010) 190 Cal.App.4th 438, 444), or when the court is mistaken about the scope of its discretion (*People v. Zeigler* (2012) 211 Cal.App.4th 638, 668). "'"""The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown."""'" (*Id.* at

---

[2] In addition to the investigative report, the district attorney submitted to the trial court Rounds's records from the Department of Corrections and Rehabilitation and records relating to Rounds's parole hearings.

p. 667.) "'"'"The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.'"'"" (*Ibid.*) Only if we can conclude as a matter of law that the court's expressed concerns regarding the lack of Rounds's rehabilitation "was not a legitimate consideration in the exercise of its discretion" may we conclude the court exceeded the bounds of reason in denying the petition. (*People v. Blocker, supra*, 190 Cal.App.4th at p. 445.)

## II.

### PETITION FOR A CERTIFICATE OF REHABILITATION

"'To enter an order known as a certificate of rehabilitation, the superior court must find that the petitioner is both rehabilitated and fit to exercise the rights and privileges lost by reason of his conviction.' [Citations.] The overall goal of the statutory scheme is 'to restore civil and political rights of citizenship to ex-felons who have proved their rehabilitation.'" (*People v. Ziegler, supra*, 211 Cal.App.4th at p. 653.)

A petitioner for a certificate of rehabilitation "shall live an honest and upright life, shall conduct himself or herself with sobriety and industry, shall exhibit a good moral character, and shall conform to and obey the laws of the land." (§ 4852.05.) A court considering a petition for a certificate may request that the district attorney investigate the petitioner's residence, criminal record, representations in the petition, and conduct during the rehabilitation period. (§ 4852.12, subd. (a).) The court also may require testimony and/or the production of records and reports relating to the petitioner and the crime, which may include the record of trial, and the petitioner's prison, parole, and probation records. (§ 4852.1, subd. (a).) Section 4852.13 gives courts discretion to decide whether a petitioner has demonstrated by "his or her course of conduct his or her

4

rehabilitation and his or her fitness to exercise all of the civil and political rights of citizenship." (*Id.*, subd. (a).)

"The hurdles erected by the Legislature to obtain a certificate of rehabilitation are not intended to be easily surmounted. The trial courts are entrusted with the responsibility, in the exercise of a sound discretion, to ensure that the strict statutory standards for rehabilitation are maintained." (*People v. Blocker, supra*, 190 Cal.App.4th at p. 445.)

The issuance of a certificate of rehabilitation must be immediately reported to the Department of Justice, which in turn must immediately record the facts on the petitioner's criminal record and transmit them to the Federal Bureau of Investigation. (§ 4852.17.) A certificate of rehabilitation, when transmitted to the Governor, constitutes an application for a full pardon; the Governor may issue a pardon based on the certificate of rehabilitation without further investigation. (§ 4852.16, subd. (a).) To grant a petition for a certificate of rehabilitation is in essence "a personal representation to the Governor" by the court that the petitioner is worthy of pardon. (*People v. Blocker, supra*, 190 Cal.App.4th at p. 445.)

"'[T]he superior court conducts a thorough inquiry into the applicant's conduct and character from the time of the underlying crimes through the time of the certificate of rehabilitation proceeding. [Citations.] The standards for determining whether rehabilitation has occurred are high. [Citations.] The decision whether to grant relief based on the evidence is discretionary in nature. . . . [T]here is no circumstance under which the statutory scheme requires or guarantees issuance of a certificate of rehabilitation by the superior court.'" (*People v. Zeigler, supra*, 211 Cal.App.4th at pp. 653–654.)

"Because 'rehabilitation logically assumes guilt' [citation], numerous state and federal jurisdictions accept that 'a court may properly consider a defendant's refusal to acknowledge guilt when evaluating the defendant's rehabilitation potential because

5

acknowledgement of guilt is a critical first step towards rehabilitation.'" (*People v. Blocker, supra*, 190 Cal.App.4th at p. 442.)

III.

ROUNDS WAS STATUTORILY ELIGIBLE FOR A CERTIFICATE OF REHABILITATION

The Attorney General concedes Rounds was statutorily eligible for a certificate of rehabilitation. We agree. We also conclude Rounds established that since committing the underlying crimes, and particularly since his release from prison, he has rehabilitated himself as required by section 4852.01 et seq.

Rounds was not convicted of any crime for which a certificate of rehabilitation is not available, the sentence imposed for his crimes would not prohibit issuance of a certificate of rehabilitation, and his petition was filed after the completion of the necessary period of rehabilitation.[3] Rounds has committed no crimes since being released from prison. Indeed, Rounds appears to have committed no acts of violence before the crime or in the 41 years since. Rounds's petition explained he wants to obtain a certificate of rehabilitation in order to be able to address children in public schools and at juvenile detention centers and encourage them not to make the mistakes he made. The certificate of rehabilitation also would open job opportunities for Rounds.

In support of his contention he has lived an honest and upright life, conducted himself with "sobriety and industry" (§ 4852.05), and exhibited good moral character, Rounds attached to his petition certificates of recognition from the Catholic Diocese of San Bernardino for participating in the Creating Hope with Youth Program in 2010, from the County of San Bernardino for completing the California Department of Corrections and Rehabilitation's 300 Days of Programming in 2012, and from the California Assembly for his accomplishments at the Day Reporting Center in San

---

[3] A petitioner may not apply for a certificate of rehabilitation if they were sentenced to death or to serve a mandatory life parole, or if they were convicted of certain specified sex crimes against children. (§ 4852.01, subd. (c).)

6

Bernardino in 2012. He received certificates of appreciation and of national service from the Urban Conservation Corps between 2011 and 2012. The Riverside Community Health Foundation and the City of Riverside Parks, Recreation and Community Services department recognized him for services as a mentor at the Keeping It Real Young Men's Conference in 2011.

In 2021, Rounds formed and currently serves as the organizer and primary consultant of a business called DrivenBound LLC; its mission statement provides: "To mentor and empower 'at promise' male youth by providing them with life skills and the examples of personal life experiences of adults who in their youth had to overcome the obstacles of serving 20 to 30 years in the California criminal justice system. To provide their parents and guardians with information and education to help them understand and know how to support and protect their youth within the educational, the juvenile justice, and the criminal justice systems." DrivenBound's services are targeted to high school sophomores and juniors and "those confined in the local juvenile justice centers."

The goals of DrivenBound are defined as follows: "Life skills education bridges the gap between basic functioning and capabilities. It strengthens the ability of an individual to meet the needs and demands of the present society. Thus, a relevant life skill education helps in dealing with emerging issues such as global warming, famines, poverty, suicide, population explosion as well as other issues like alcoholism, drug abuse, sexual abuse, smoking, juvenile delinquency, anti-social acts, etc. that have an adverse effect on them and others too, to a large extent. Today's youth are facing social, emotional, physical and psychological issues. Cut-throat competition, unemployment, lack of job security, etc. are some of the major concerns for the educated and as a result, they are caught in the mad race. No one has time for his/her 'self, to develop empathy with surrounding and have harmony in society. The new challenge requires immediate and an effective response from a socially responsible system of education. Education, now a days is hence, very important, but the kind of education, to support and live life

7

better is more important. Thus, the cardinal focus of Education, therefore, needs an extraordinary emphasis on developing such skills in students, as they are the important building blocks for a dynamic citizen, who can cope up with future challenges and survive. Life skills education has its importance and significance in overall development of students. DrivenBound LLC will implement the 'Overcoming Obstacles Life Skills Program', which includes curriculum materials, teacher training, and ongoing support. The Overcoming Obstacles Life Skills Program provides educators with the middle school and high school curriculum materials, training, and ongoing support they need to teach their students the life skills necessary for graduating high school, succeeding in college, and finding productive careers.

"Both levels of the program cover over 20 important topics that are relevant to success in the real world, including communication, decision making, goal setting, and conflict resolution skills. Overcoming Obstacles is an award-winning, and research-based K-12 curriculum that provides you with the tools to teach our youth life skills. With hundreds of activity-based lessons covering more than 30 critical social and emotional skills, our youth learn how to communicate effectively. They learn how to make informed decisions. They learn how to set and achieve goals, resolve conflicts, solve problems, respect one another, and more."

Rounds also has been active with Operation New Hope, a reentry program for the previously incarcerated, from the date he was released on parole in 2010 through at least 2022. Russell Degnan, the chief executive officer of Operation New Hope, submitted a letter in support of Rounds's petition. Degnan explained Rounds was enrolled in the Prison to Employment program, where he "thrived" and became a student ambassador mentoring others returning home from the California Department of Corrections and Rehabilitation. Through Operation New Hope, Rounds had facilitated reentry workshops; Degnan noted that from 2012 through 2017, "Riverside County District Attorney's office Project Safe Neighborhood Initiative consistently requested Mr.

8

Rounds to facilitate and present to high schools and middle schools his personal testimony by sharing his life journey of repairing, restoring, and reviving his community membership within the community." Additionally, Degnan noted Rounds "is passionate about his goals of developing a business to help improve the gaps within the reentry process to salvage our youth. He has displayed exceptional reentry into the community; working and actively engaged in the local cities, volunteering, mentoring, and now educating the next generation to develop healthy relationships, positive decision-making skills, and a road map to success."

While in prison and after his release, Rounds pursued educational opportunities. He became certified as a diagnostic radiologic technologist. Rounds completed all assignments in the San Bernardino County Workforce Department's Job Readiness Seminar and is fully bondable. He earned an Associate of Arts degree from San Bernardino Valley College, where he was on the dean's list for two semesters and received certificates of achievement.

Rounds has been married and lived in the same residence for the last 12 years. He has been employed with Amazon for seven years. In support of his petition, Rounds provided letters of recommendation from his adult daughter, the chief executive officer of the Transformational Leadership Consortium; the manager of the Urban Conservation Corps, who worked with Rounds as part of the AmeriCorps program; Degnan; Rounds's cousin; and Rounds's wife.

IV.

THE TRIAL COURT'S ORDER

The trial court denied Rounds's petition for a certificate of rehabilitation because of what the court characterized as "the egregious nature of the offenses and defendant's conflicting explanations as to what occurred particularly regarding his mental state." As explained below, the court's denial of the petition was a manifest abuse of

9

discretion, as it was based almost entirely on factors not properly part of the statutory analysis, amounting to a miscarriage of justice.

## A. *The Nature of the Crime*

As to the nature of the crime, the trial court quoted from and relied primarily on the conclusion of the Parole Board at a 2006 hearing, at which Rounds was denied parole, that the offense was carried out in an especially callous manner: "'Multiple victims were attacked, injured or killed in the same incident. [A.G.] was murdered, [T.G.] was shot three times in the upper torso in an attempted murder, and [T.G.'s girlfriend] was slapped with the barrel of the gun. The offense was carried out in a dispassionate and calculated manner, in that . . . you went to your home, obtained a weapon, returned to the scene and began shooting at [A.G. and T.G.]. Public safety was at risk from the gunfire in the neighborhood. You had a clear opportunity to cease but you continued. Moreover, the motive for the crime is inexplicable. Your act in going and getting a weapon and returning to shoot two family members is simply inexplicable.'"[4]

Murder, of course, is by its very nature a serious and brutal crime, with consequences that will likely be forever felt by family and friends of the victims. Nevertheless, the Legislature has not seen fit to exclude those convicted of murder from seeking or obtaining a certificate of rehabilitation. Yet the trial court expressed its belief that granting Rounds's petition would be unfair to his victims: "Why do you think it's fair that I grant you a Certificate of Rehabilitation when [A.G.] is dead? He can't—he's been dead for over 40 years now. He can't exercise any of his rights. His family has to live with him being gone. They have to live with that eternal grief, pain, and suffering.

---

[4] The transcript of the 2006 parole board hearing is not in the appellate record. In 2010, the United States District Court denied a petition for a writ of habeas corpus filed by Rounds challenging the parole board's 2006 finding of parole ineligibility. (*Rounds v. Sisto et al.* (case No. 2:07-cv-01670-MMM.) In the order denying the habeas corpus writ petition, the district court quoted the parole board; it is that quote the trial court here relied on.

And [T.G.] walks around today with bullets still in his body as a constant reminder of what happened to him and what happened to his brother and he is permanently scarred physically and emotionally from what happened.  This isn't a case like where you break into somebody's house, you steal some things, you break some things, you go to prison, you serve your debt to society, you make restitution, everybody is compensated for what happened.  You can't bring [A.G.] back and you can't fix with what happened to your other step uncle.  [¶]  Why do you think it's fair that I should—wipe away the consequences when the family—the consequences for you when the family and your step uncle still have to live with that every day?"

Nothing in the statute or case law permits the trial court to consider the specifics of the crime itself or the fairness to the victim (or the victim's family) of granting the petition.  To the contrary, section 4852.03 provides the "period of rehabilitation" begins upon the discharge from custody or the release from parole, probation, postrelease community supervision, or mandatory supervision.  (See *People v. Zeigler, supra*, 211 Cal.App.4th at p. 653.)[5]

Section 4852.05 provides a petitioner for a certificate of rehabilitation "shall live an honest and upright life, shall conduct himself or herself with sobriety and industry, shall exhibit a good moral character, and shall conform to and obey the laws of the land." (*Ibid.*)  Read together, the statutes necessarily compel the conclusion that a trial court evaluating a petition for rehabilitation should consider the petitioner's postrelease conduct, not the circumstances of the underlying crime.  Where, as here, the statutory criteria for rehabilitation are met, a certificate of rehabilitation cannot be denied based on the severity of the crime of which the petitioner was convicted.  If a court could

---

[5]  Section 4852.03, subdivision (a), provides:  "The period of rehabilitation commences upon the discharge of the petitioner from custody due to his or her completion of the term to which he or she was sentenced or upon his or her release on parole, postrelease community supervision, mandatory supervision, or probation, whichever is sooner."

harken back to the seriousness of the long-ago offense to deny relief, no one who has committed a serious or violent crime could ever receive a certificate of rehabilitation. That is not what the statute provides and, given the Legislature's failure to exclude convicted murderers from eligibility, manifestly not what the Legislature intended.

## B. *Rounds's Description of the Crime*

Whether the defendant has admitted his culpability in the underlying crime is a factor the trial court may appropriately consider when ruling on a petition for a certificate of rehabilitation. In affirming denial of a petition in *People v. Blocker, supra*, 190 Cal.App.4th 438, the appellate court noted the trial court "had a genuine concern that Blocker's adamant refusal to admit any criminal culpability was a cloud on Blocker's claimed rehabilitation. Because we cannot conclude as a matter of law that the trial court's concern was not a legitimate consideration in the exercise of its discretion [citations], we cannot conclude that in denying Blocker's petition the trial court exceeded the bounds of reason." (*Id.* at p. 445.)

The trial court here construed Rounds's explanation of what happened as an apparent attempt to claim self-defense. The court said: "[H]ere's part of my problem. What I'm hearing now and, I guess originally what you said, it sort of comports to what you said in the police report, is that you were kind of acting in self defense because they had challenged you. And when you came back with the gun, you didn't intend to shoot anybody and it developed from there based on the threats that they made. [¶] What you told the parole board was that you must have intended to shoot them because that's why you got the gun and pulled it out. So in my mind those are two different things." The court therefore found Rounds was not rehabilitated because he was not taking responsibility for the crime he committed.

We therefore examine Rounds's statements to determine if they fairly reflect a refusal to accept responsibility for his conduct.

1. The Petition

In his petition for a certificate of rehabilitation, Rounds described the circumstances of the crime as follows: "On November 25, 1981, I decided to wash [D.G.]'s car, while washing the car [T.G.] drove up and parked in front of the driveway and said don't get water on my car. We began arguing his mother came outside and broke us up from arguing. I finished and [T.G.] and [D.G.] took off without paying me so I waited and when they returned [T.G.] and I began arguing again. When he said that he was going to whip my ass, I ran home and returned with a concealed weapon. [A.G.] was now there circling around in front of the driveway. When I got in front of the driveway [T.G.] had his car backed in the driveway and [D.G.] was gone. I said to [T.G.], I know you are packing (a gun) he was at the back of his car with his foot on the bumper. Right then [A.G.] said, 'me and you head up' I then pulled the gun from behind me and said you want to go heads up now? He then said you are dead MF, you dead. I began shooting, [A.G.] fell and I began shooting at [T.G.], chasing him until I was out of bullets. I turned myself in and plead guilty to second degree murder and attempted murder. I have always felt sorry for what I did to [their family] and my family that was also devastated by my actions that day. I still regret the pain and irreparable damage I caused. I will spend the rest of my life trying to make an amends."

2. Hearing on the Petition

At the hearing on the petition, Rounds described what happened as follows, in relevant part: "When they came back, me and [T.G.] started fighting again; we started getting into an argument again. When we got into an argument again, that's when the exchanges came. [¶] . . . [¶] [W]e were arguing because he said—basically he told me that he was gonna whoop my ass, you know, and that I told him that he wasn't. And so that's when he came towards me, and that's why I ran and took off and came back and had a gun behind me. [¶] . . . [¶] When I came back—that's after I came back—when I came back with the gun. So when me and [T.G.] was arguing, [A.G.] came and [T.G.]

13

was, like, behind his car, 'cause I was, like, 'I know you're packin'.'  So when [A.G.] came in front, [A.G.] was, like, 'Me and you heads up,' 'cause, you know—out of nowhere he's like, 'Me and you heads up,' like that, 'cause he didn't really have anything to do with it at all, you know, the situation.  That's why I pulled it—'cause I never had the gun out or anything.  That's when I pulled the gun out and that's when I asked him, 'Do you wanna go heads up now?'  [¶]  And he told me I was dead.  He said, 'You're dead, mother fucker.  You're dead.'  And that's when I fired shots."

3.  2010 Parole Board Hearing

At his 2010 parole hearing, Rounds described the circumstances of his crime as follows:  "When I came back to confront [T.G.], I passed [A.G.] and—in front of the driveway.  That's when me and [T.G.] began to dialogue again, talking, you know, arguing. And that's when [A.G.] intervened and me and him began arguing.  And there was words exchanged that I allowed to inflame me and get me upset and so that's when I did pull the gun from behind me.  And when statements were made I fired one shot and that one shot—[¶] . . . [¶] I fired one shot at [A.G.] and that one shot he fell to the ground which was an opportunity for me at that time to desist but I didn't desist, instead you know, I turned the gun on [T.G.], you know, as he was turning away that was another opportunity for me to desist and I didn't desist at that time either."

"And what caused me to go get the gun, I believe, is that—that's what I used to substitute, what I consider something that they would respect but I know that was wrong.  I know that getting a gun don't bring respect so having that gun—going to get that gun really was flawed in thinking that that was going to bring about some kind of respect from them but when I came back, you know, and confronted them thinking that I could control that situation—totally was wrong about being able to control it, you know, because that was one of my things too, thinking I could control that situation, but I couldn't, you know."

14

4.  Did Rounds Change His Story?

Although the trial court found Rounds had changed his story from the parole hearing to the hearing on the petition for a certificate of rehabilitation, we conclude substantial evidence does not support that finding.  To the contrary, a careful review of the statements Rounds made to the parole board, in his written petition, and at the hearing on the petition shows that although some of the statements contained more (or fewer) details of the shootings than others, his description of the events was consistent. He admitted to leaving the scene of an argument with the victims, getting a gun and returning to the scene, and then shooting the victims.  Although Rounds stated his belief that one of the victims had a gun on his person, he never claimed the victim drew his weapon first; to the contrary, he consistently acknowledged he drew his weapon in response only to verbal challenges or threats.  His statements do not fairly evidence a refusal to accept responsibility or show remorse for his conduct.

*C.  Other Issues Raised by the Trial Court in Denying the Petition*

The trial court also faulted Rounds for pleading guilty to second degree murder.  First, the court appeared to hold it against Rounds that he did not plead guilty to first degree murder, insisting, "[i]n the court's view this was *the willful, deliberate and premeditated murder and attempted murder* of [A.G. and T.G.] for which the petitioner has never taken full responsibility."  (Italics added.)  In the process of plea bargaining, criminal defendants often (if not typically) plead guilty to obtain a benefit, "'generally consisting of a less severe punishment than that which could result if he were convicted of all offenses charged.'"  (*People v. Stamps* (2020) 9 Cal.5th 685, 705.)  Likewise, prosecutors often (if not typically) agree to such pleas in order to obtain a benefit, including the certainty of a prompt disposition without having to prove (or run the risk of not being able to prove) the defendant guilty beyond reasonable doubt at trial.  (See *People v. Prudholme* (2023) 14 Cal.5th 961, 978 [by entering plea bargain, the State

obtains "'certain ultimate result'"].)  It is not unheard of for a prosecutor to offer or accept a second degree murder plea because of anticipated difficulties in proving a first degree murder charge.  Denying a certificate of rehabilitation to a defendant on the grounds that he accepted the prosecutor's offer of such a plea would be manifestly unfair.

The trial court further suggested Rounds's plea to second degree murder was simply an attempt to avoid prison and be sentenced to the California Youth Authority instead.  The court stated:  "While it is true defendant plead guilty to the charges, that plea was entered for a reduced sentence and the hope that by doing so he would be placed in [the California Youth Authority]."  Even assuming the court correctly surmised Rounds's motivation for pleading to the second degree murder charge,[6] that is not properly or fairly part of the analysis under section 4852.05.

In this regard, we note Rounds turned himself in to the police the day after the shooting and pled guilty to second degree murder.  That is hardly the conduct of a young man who refused to accept responsibility for his conduct.

---

[6]  The only apparent support in the record for the trial court's supposition regarding Rounds's motivation is a statement in a 1983 probation report prepared for Rounds's sentencing, in which a probation officer offered his opinion that "[i]t *appears* the defendant entered the plea with the understanding that the . . .  offense would be filed as second degree and that commitment to the California Youth Authority would be considered as a sentencing alternative."  (Italics added.)  Even if a defendant's reason for entering a plea were relevant to whether he has been rehabilitated, a probation officer's speculation about what prompted Rounds to plead guilty is hardly evidence of the defendant's motivation.  In any event, we note that even if the probation officer correctly surmised that this hope or expectation is what motivated Rounds to agree to plead guilty to second degree murder, Rounds's hopes were not realized.  He was sentenced to, and served 27 years in, state prison before being paroled.

## DISPOSITION

The postjudgment order is reversed and the matter is remanded to the trial court with directions to grant the petition for a certificate of rehabilitation and pardon.


GOODING, J.

WE CONCUR:


MOORE, ACTING P. J.


GOETHALS, J.

17